## URI L. LAMPREY et al. vs. WARREN H. MEAD et al.

Argued by appellant, submitted on brief by respondents, July 14, 1893.   Affirmed
July 24, 1893.

### Rights of Patentee of Riparian Lands.

> Where a patent issues for a fractional lot appearing by the plat of the
> United States survey to be bounded on one side by a meandered lake,
> the patent is not void so far as it purports to convey the land under the
> water, though it was error in the survey to treat the tract covered by
> the water as lake to be meandered, instead of land to be surveyed.
> Conceding the patent to that extent to be voidable, it can be avoided
> only by the United States, in a proceeding to which the patentee is a
> party.

Appeal by the defendant, the St. Paul, Minneapolis & Manitoba
Railway Company from an order of the District Court of Ramsey
County, *Hascal R. Brill*, J., made March 27, 1893, denying its mo-
tion for a new trial.

The plaintiffs, Uri L. Lamprey and wife, filed their complaint
April 4, 1892, against Warren H. Mead, Philip Reilly and Oscar M.
Metcalf for partition, stating that Lamprey owned seven-tenths
and each of the others one-tenth of an irregular unoccupied piece
of land containing about eighty acres, lying in the southeast corner
of section five (5), T. 28, R. 22, in West St. Paul, worth $50,000.   It
is in the northwest corner of the part marked Lake on the accom-
panying map.   The various railroad companies, which succeeded to
the land grants under the Act of March 3, 1857, (11 U. S. Stat. ch.
99, p. 195,) were also made defendants as adverse claimants of this
land, lying in an odd section.   The St. Paul, Minneapolis & Man-
itoba Railway Company appeared and answered that it had suc-
ceeded to the rights and land grant of the Minnesota & Pacific Rail-
road Company, acquired under the Act of the Territorial Legislature
approved May 22, 1857, and claimed title to the land under this
Congressional and Territorial legislation.   It alleged that its map
of definite location of its line of road in the vicinity was filed Decem-
ber 5, 1857, and it claimed this land in section five (5) as within the
grant, and not then otherwise appropriated.   The other railway
companies disclaimed any interest.   In 1853 the property was a

natural lake, and the title in the Federal Government. The surrounding shore was surveyed and the lake meandered, in September of that year, under the direction and supervision of the Secretary of the Interior. The shore lands were sold in 1856, and patented to the remote grantors of the plaintiff and his cotenants. The patents referred to the plat of the survey on file in the General Land Office, and contained no reservation or limitation whatever. In 1860 the lake had so far receded that the Federal Government surveyed the land between the then shore and the old meander line, and on March 20, 1873, sold and patented this strip to Charles D. Gilmore, who subsequently conveyed it to plaintiffs and their cotenants. The lake has slowly receded and diminished in size, from year to year, until its bed is now nearly all dry land.

At the trial the Railroad Company offered to prove the rules and regulations of the land department of the Federal Government under which the surveys of this land, and supposed lake, were made, and also the field notes of those surveys, and the surveyor's reports to the General Land Office and the approval thereof by the Secretary of the Interior. It also offered to prove that the patentees when they purchased in 1856 resided near the lake and knew its condition, extent and the cause of its formation. That it was shallow, easily drained and likely to dry up. That the meander line, as shown on the map, was made in violation of the rules of the Department. That in those early times, at very high water in the Mississippi River, it would overflow its banks into this depression, where the water would remain until it leached away or dried up, leaving the bottom mere marsh and swail, fit for meadow and pasturage and containing sedge-grass, wild rice, wire grass, rushes and flower de lis. That the bottom of this supposed lake was three feet higher than the surface of the water in the Mississippi River at its ordinary stage, and that the land between the river and the lake was from four to eight feet higher than the bed of the supposed lake. That it could then, and can still, be readily drained into the river by a ditch, from four to eight feet deep and eighty rods long. It also offered to prove that when the survey was made in 1853 the river was high, overflowing its banks; that the water in the lake had never been more than about three feet deep in the deepest parts when the river was not actually overflowing into it.

This was all objected to and excluded, and the Railroad Company excepted. It claimed that the patentees acquired no rights inside the meander line, and that so much of the so-called lake as lay within section five (5) and within the meander line was not sold or apportioned when the map of the definite line of its road was filed, December 5, 1857, and that under the legislation above mentioned the title to it vested in the St. Paul & Pacific Railroad Company, and passed to defendant as the grantee and successor of that corporation. The claim of the state to the whole of this lake was adjudged invalid in *Lamprey* v. *State*, 52 Minn. 181.

*John M. Gilman* and *M. D. Grover*, for appellant.

The title or interest of plaintiffs in the land in suit rests upon the patents and survey as shown on the plat referred to. It was competent for defendant to show that such land was not included in the description contained in the patent. That the boundary was not a lake, but the meander line. That plaintiffs acquired no riparian rights to the land in suit, for the reason that such land did not, and does not, abut upon any lake or body of water. The patent and plat are not conclusive as defining the boundary of the land conveyed. Defendant had a right to controvert and defeat the *prima facie* case made by plaintiffs upon the patent and survey, by showing that the meander line was not the boundary of the lake designated on the plat, or of any lake. That there was no lake as shown upon the plat, and that there was fraud or mistake in the survey. Land cannot pass as appurtenant to land. *Jones* v. *Johnson*, 18 How. 150; *Bates* v. *Illinois Cent. R. Co.*, 1 Black, 204; *Illinois Cent. R. Co.* v. *Illinois*, 146 U. S. 387.

A meander line will be held to be coincident with the boundaries of a lake, and the lake will be held to be the boundary of land conveyed abutting upon it, when the meander line is substantially coincident with the actual border of the lake. *Hardin* v. *Jordan*, 140 U. S. 371; *Mitchell* v. *Smale*, 140 U. S. 406.

If then it may be shown that a meander line appearing upon a plat was located as coincident with the borders of a lake or river by mistake, or fraud, the question arises, do not the offers of the proof in this case show such mistake or fraud, on the part of the sur-

veyor in making the plat and survey in question? *Granger* v. *Swart*, 1 Woolworth, C. C. 88; *Bissell* v. *Fletcher*, 19 Neb. 725; *Lammers* v. *Nissen*, 4 Neb. 245; *Harrison* v. *Stipes*, 34 Neb. 431; *Whitney* v. *Detroit L. Co.*, 78 Wis. 240; *Glenn* v. *Jeffrey*, 75 Iowa, 20; *Schurmeier* v. *St. Paul & Pac. R. Co.*, 10 Minn. 82, (Gil. 59.)

The plat shows only a lake. The field notes show a line running a given distance to and from certain definite points. There was no lake in fact. The meander line was run at a time of high water and a temporary overflow of the Mississippi River. It ran along dry land never covered by water, except in case of high water and overflow of the Mississippi River. The meander line did not correspond with the segregation line between dry, and swamp or overflowed land, but was located on dry land at a considerable distance outside of the segregation line between dry, and swamp or overflowed land. No part of any lake was ever upon, or even touched the lot described in the patent. In the absence of a lake, the call of the patent can only be answered by seeking another boundary line. A boundary line was fixed and established by the survey, that is in the courses and distances of the meander line, which are stated in the field notes, and can now be indicated on the ground.

*Stryker & Moore*, also for appellant.

There is involved in the case at bar, no lake and no true meander line, and the land claimed by plaintiffs is not described in their deeds nor in the patents under which they hold. The *locus in quo* lies within lines run by surveyors to represent the meanderings of a lake, which in fact has never existed. Defendant offered to prove this at the trial, but its evidence was excluded. This land is claimed by plaintiffs because they are owners of other lands purchased from the government around this imaginary lake, according to the official plat of the survey of said land returned to the General Land Office by the Surveyor General. On examining the government plat, we find that each of these several lots is represented as bounded by a lake. If such a lake ever existed, it must be conceded that plaintiffs' title is established, under the rulings of this court in *Lamprey* v. *State*, 52 Minn. 181, and of the Supreme Court of the United States in *Hardin* v. *Jordan*, 140 U. S. 371.

If a lake did not exist, then only in case of an estoppel, by reason of the making of the map, and reference thereto in the patent, are the government and its grantees, the railroad companies, precluded from defeating plaintiffs' claim. But estoppel does not exist if defendant is able to substantiate its offer to prove actual knowledge on the part of the plaintiffs and their grantors, that the lake represented on the map never existed. And, considering plaintiffs' case alone, it is apparent from the inception of their title that the original patentees must have had knowledge of the non-existence of the lake (if there was none in fact), for these patentees were pre-emptors, and must, under the law, have been in actual occupation of the land, and have resided upon it, before the patent issued. The basis of an estoppel is then entirely wanting in this case. Plaintiffs and their grantors have always acted with actual knowledge that there was no lake. They have never been misled in that regard by anyone. They have always known that the official plat was erroneous. *Nell* v. *Dayton*, 43 Minn. 242; *Schurmeier* v. *St. Paul & Pac. R. Co.*, 10 Minn. 82, (Gil. 59;) *Drew* v. *Swift*, 46 N. Y. 204; *Herrick* v. *Churchill*, 35 Minn. 318; *Myrick* v. *Coursulle*, 32 Minn. 153.

*John A. Larimore*, for respondents.

The St. Paul, Minneapolis & Manitoba Railway Company contends that it owns all of section five which had not been disposed of by the government prior to December 5, 1857. It admits that the government patents conveyed all not within the meanders of the lake, but denies that the patents conveyed any of the land inside of the meander line, because the waters which were meandered never should have been meandered at all. That, in making the survey, the lake was meandered through mistake or fraud. As the patents were prior to the railroad grant the lands were not conveyed by that grant, but on the contrary, were by its terms excepted from the grant. As none of the lands in the suit were conveyed by the railroad grant, it follows that the defendant has no right in the lands, and that having no right it cannot question plaintiffs' patent title. That the patents of the land bordering on this non-navigable, meandered lake, embraced and conveyed the bed of the lake is a question no longer open to litigation in this state. It is forever set-

tled in *Lamprey* v. *State*, 52 Minn. 181, which was a suit involving this same lake. Lands subject to a claim, legal on its face, at the time the railroad grant takes effect are excepted from the grant. Even if the claim is subsequently abandoned or canceled, or is illegal, the grant will not cover the land. If the grant, when it takes effect, does not embrace the land, then the land can never be brought within the grant, no matter what the facts are. Copp's Land Owner, vol. 1, p. 36; vol. 3, pp. 85, 179; vol. 4, pp. 123, 163; vol. 5, p. 180; vol. 8, p. 161; vol. 9, pp. 201, 236; vol. 10, pp. 13, 20; vol. 11, pp. 9, 117, 150, 151, 171, 122, 252, 264; vol. 12, pp. 9, 39, 55, 138, 161, 208, 277; vol. 13, pp. 21, 124, 149, 136, 250; vol. 14, pp. 30, 55, 75, 156, 167, 204; vol. 15, pp. 90, 103, 152, 187; vol. 17, pp. 67, 142; vol. 18, pp. 19, 214.

The foregoing are some of the many decisions of the Land Department showing that its uniform rule for many years has been, that land situated as the land involved in this case was, at the time of the railroad land grant, is excepted from the grant and cannot be brought within its provisions. *United States* v. *Burlington & M. R. R. Co.*, 98 U. S. 334; *Hastings & D. R. Co.* v. *Whitney*, 34 Minn. 538; *St. Paul & S. C. R. Co.* v. *Ward*, 47 Minn. 40; *Winona & St. P. L. Co.* v. *Ebilcisor*, 52 Minn. 312; *Hastings & D. R. Co.* v. *Whitney*, 132 U. S. 357; *Sioux City, etc., L. Co.* v. *Griffey*, 143 U. S. 32; *Bardon* v. *Northern Pac. R. Co.*, 145 U. S. 535.

If there was a mistake or error in this, (the issuing of the patent,) no one but the United States, or some one having an interest in the land, could complain. *Dawson* v. *Mayall*, 45 Minn. 408. The railroad company concedes that the plaintiff made out a *prima facie* case. Then it admits and concedes that the patent title was regular and legal on its face; then it concedes and admits that at the time the railroad grant was enacted and took effect, there was a claim, valid on its face, against the land. It admits and concedes the plat showed one boundary of the land to be the lake, and the patent was given pursuant to the plat, making it a part thereof, then it admits and concedes that the lake was the boundary on that side of the land covered by the patent. And the lake being used as a boundary, its center line was the boundary line; and therefore it admits and concedes that the patent on its face covered the land—conveyed the

lake bed. When the defendant made its offer of proof in the court below, plaintiff objected to the defendant's assailing the patent title, upon the ground that as the patents were prior to the railroad grant, the lands covered thereby were excepted from it; and the defendant having no interest in the land, any testimony in that direction on its part was incompetent and immaterial. The objection was sustained; not upon the ground that the defendant might or might not be able to prove its offer, but upon the ground that as it had no interest, it had no right to go into the question.

Counsel cite several cases from Nebraska to the effect that the meander line is the boundary line, and not the water. They are not authority in this court. It has always been the law in Nebraska that the meander line was the boundary line, whether it coincided with the water or not. It is the only state in the Union which holds that doctrine.

The validity of a patent of the government, cannot be assailed collaterally because false and perjured testimony may have been used to secure it, any more than a judgment of a court of justice can be assailed collaterally on like ground. Until set aside, it must, of course, stand against a collateral attack with the efficacy attending judgments. It cannot be vacated or limited in proceedings where it comes collaterally in question. This can be accomplished only by regular judicial proceedings, taken in the name of the government, for that special purpose. *Steel* v. *Smelting Co.*, 106 U. S. 447.

GILFILLAN, C. J. The action is for partition. The complaint claims that the plaintiffs and the defendants Mead, Reilly, and Metcalf are the owners, as tenants in common, of the land, and the other defendants are joined to determine their claim of title. The other defendants who answer claim under the railroad land grant to the Territory in 1857. The lands in township No. 28 N., of range No. 22 W. of the fourth P. M., were surveyed in 1853, the subdivision lines being run in September of that year. The map or plat of the survey was filed in the office of the surveyor general, and was by him examined and approved February 27, 1854. In May, 1855, patents issued for lot 9, section 4, and lot 9, section 5, and in March, 1855, a patent issued for lots 4 and 8, section 5. The plaintiffs and defendants Mead, Reilly, and Metcalf claim under these patents.

On the map or plat was a tract marked "Lake," on which the lots
so patented abutted.    The following rough diagram shows approxi-
mately the position of the lots with reference to the "lake."

All the lands surrounding the lake were surveyed, and appear
platted as fractional lots.    The controversy is over the bed of what
is designated "Lake" in front of the patented lots, the plaintiffs
claiming that, according to the law as laid down in *Hardin* v. *Jordan*,
140 U. S. 371, (11 Sup. Ct. Rep. 808, 838;) *Mitchell* v. *Smale*, 140 U. S.

406, (11 Sup. Ct. Rep. 819, 840;) and *Lamprey* v. *State*, 52 Minn. 181, (53 N. W. Rep. 1139,) the title to the bed of the lake in front of those lots passed by the patents, the defendants claiming under the land grant that by reason of the facts which they offered to prove it remained in the United States, and passed by the land grant to which those defendants have succeeded.

On the trial the plaintiffs introduced the plat and patents and deeds passing the titles derived under the patents to them and the defendants Mead, Reilly, and Metcalf, and rested. The other defendants made certain offers of evidence, which, on plaintiffs objecting, were overruled. These offers and the rulings thereon present the questions in the case. The offers are too long to be quoted in this opinion, but they included a survey of the land covered by the "lake," made and approved in 1861, and facts which it is claimed would establish, not that when the original survey was made the water did not cover the tract marked "lake," but that it ought to have been surveyed as land, and not to have been meandered as a lake. Conceding that the water was there at the time of the survey, and presented the question whether for the purpose of the survey it ought to be regarded as a lake or as land, the offers are, in effect, to impeach the survey by showing that it was error or mistake to regard it as a lake. The proposition suggests a question of great practical importance. It is a serious matter, in this state at least, where, as is of common knowledge, what was undoubted lake ten years ago might five years later be only marsh, and to-day dry land, if, after the lapse of forty years, a United States survey representing a tract of water as meandered lake, and according to which the government has conveyed the abutting land, can be impeached, and the rights of the patentees unseated. But the question is not presented in this case for solution. Of course, so long as the government had not conveyed any of the lands abutting on the lake, it could correct the survey, survey the tract under the water as land, and convey it as such. And it may be conceded (though it is by no means clear) that the government is not bound by an erroneous or mistaken survey, even after it has conveyed the land according to it; but it cannot correct such erroneous survey so as to defeat or injuriously affect the rights of its patentees by any *ex parte* acts, or in any way except by a proceeding to which such patentees

are parties, and in which they have an opportunity to be heard. It has no more right to limit or diminish the effect of its past grants by its own acts than has a private grantor. *Lindsay* v. *Hawes*, 2 Black, 554, furnishes an instance in which, rights having been acquired under an erroneous survey, it was held that a subsequent correct survey did not defeat the rights so acquired. It follows that the survey of 1861 does not affect the case.

The patents conveyed the fractional lots according to the survey as it was represented by the plat. The latter was therefore part of the patents as much as though it were fully set forth in them. On their face they transferred to the patentees the right to the land under the water, not as defendants seem to argue, if appurtenant and as appurtenant to the shore land, but they took the fee, (a fee cannot be appurtenant,) because, when land is bounded in the conveyance by a nonnavigable lake or river, it is presumed the parties intend the center, and not the shore, line to be the boundary. They may limit the grant to the shore line if that intention be sufficiently expressed. The patents, even though it could be proved that the survey was a mistake, and that the determination of the government surveyors and officials that the water on the land when the survey was made constituted a lake to be meandered was erroneous, were not void so far as they purported to convey the land under water. At worst they were only, to that extent, voidable at the instance of the government, in proper proceedings for reformation of the patents. *White* v. *Burnley*, 20 How. 235; *Spencer* v. *Lopsley*, Id. 264. The case is not one where a boundary given is an impossible one; where the monument given as marking it does not exist, or cannot be found. In such a case the boundary or monument must be disregarded, and the extent of the grant ascertained by other means, if the conveying instrument furnish them. There might be a case where the land is in terms bounded by a lake or river, and no lake or river is in fact to be found where the granting instrument indicates it to be. There might, in such a case, be a question how far the court will go to find such boundary before resorting to other means to define and locate the grant. Such a case was presented in *Whitney* v. *Detroit Lumber Co.*, 78 Wis. 240, (47 N. W. Rep. 425.) In that case a fractional lot was wholly in a quarter of a quarter section, if full, and appeared by the plat of the survey to be bounded

by a lake partly on that forty-acre tract. The decision was, in effect, that the court would not go, to find the lake as a boundary and locate the land, beyond the limits of the governmental subdivision of which the lot purported to be a fraction. Such is not this case. In this case the boundary given was where the survey indicated, the only claim being that it was mistake or error in the survey to treat the water as lake. The patents being at worst only in part voidable, they passed the land, and, if the government choose to acquiesce in and abide by them, no one else can complain. If a patent issue to A., when it ought to have issued to B., or if a patent issued to A. prejudice the existing rights of B., the latter may have his remedy against A.; but one who has no interest which is affected by the patent cannot question it. *Minnesota Land & I. Co.* v. *Davis,* 40 Minn. 455, (42 N. W. Rep. 299.) The defendants do not even stand in the position of one acquiring a subsequent title or claim of title from the United States. The grant of 1857 attached to no land which, when the lines of railroad were definitely located, had been otherwise appropriated by the United States. The decisions are uniform that land, the claim to which, though ill founded, was sub judice,—that is, awaiting determination,—was excepted from the operation of the grant, because otherwise appropriated within the meaning of the act. An outstanding patent, though voidable, is an appropriation, within the reason of that rule.

Order affirmed.

(Opinion published 55 N. W. Rep. 1132.)