SECURITY LAND & EXPLORATION COMPANY v. G. A. BURNS
and. Another.[1]
SAME v. HENRY WECKEY and Another.

July 11, 1902.

Nos. 12,912, 12,913—(94, 95).

**Boundary—Meander Line—Fractional Lots.**

A meander line is not, as a general rule, a boundary line; yet the boundaries of fractional lots cannot be indefinitely extended where they appear by the government plat to abut on a body of water which in fact never existed at substantially the place indicated on the plat. In such exceptional cases, the supposed meander line will, if consistent with the other calls and distances indicated on the plat, mark the limits of the survey, and be held to be the boundary line of the land it delimits.

**Finding of Court Sustained.**

Rule applied, and *held*, upon the special facts of this case, that the trial court correctly held that a line on a government plat purporting to be a meander line was intended to be the boundary line of the fractional lots here in question.

Separate actions in ejectment in the district court for St. Louis county by plaintiff, Security Land & Exploration Company, against defendants G. A. Burns and another, and defendants Henry Weckey and another. The cases were by consent tried together before Cant, J., who found in favor of defendants. From separate judgments entered pursuant to the findings, plaintiff appealed. Judgments affirmed.

*Billson, Congdon & Dickinson,* for appellants.

The so-called meander line is not a factor in the case. Schurmeier v. St. Paul & Pac. R. Co., 10 Minn. 59 (82), 7 Wall. 272; Sizor v. City, 151 Ind. 626, 628; Boorman v. Sunnuchs, 42 Wis. 233; Everson v. City of Waseca, 44 Minn. 247; Lamprey v. State, 52 Minn. 181; Forsyth v. Smale, Fed. Cas. No. 4950; Hardin v. Jordan, 140 U. S. 371; Middleton v. Pritchard, 3 Scam. 510; Mitchell v. Smale, 140 U. S. 406; Schlosser v. Cruickshank, 96 Iowa, 414;

[1] Reported in 91 N. W. 304.

Menasha v. Lawson, 70 Wis. 600; Coburn v. San Mateo Co., 75 Fed. 520, 530. It is not a material circumstance that the government contractor and deputy surveyor to whom the government confided the subdivision of this township may have fraudulently neglected to perform his duty. Murphy v. Kirwan, 103 Fed. 104, 107; Newsom v. Pryor's Lessee, 7 Wheat. 7; Stafford v. King, 30 Tex. 257; Phillips v. Ayres, 45 Tex. 601; Jones v. Burgett, 46 Tex. 284, 292. It is not material that, in order to accommodate with the frontage upon the lake all of the tracts which by the plat are shown to have such frontage, a deflection of the side lines of the several tracts becomes necessary, or that, unless deflected, the extended side lines of a portion of the tracts would not strike the lake. Murphy v. Kirwan, supra. Each of plaintiff's lots 3, 5, 6, and 7 in section 4, extend in fact from the township line to Cedar Island lake, in accordance with the indications of the township plat. Cragin v. Powell, 128 U. S. 691; Lamprey v. Mead, 54 Minn. 290, 299; Hardin v. Jordan, supra; County of St. Clair v. Lovingston, 23 Wall. 46, 63; Nicolin v. Schneiderhan, 37 Minn. 63; Shufeldt v. Spaulding, 37 Wis. 662; Higueras v. U. S., 5 Wall. 827; Kirwan v. Murphy, 83 Fed. 275; Murphy v. Kirwan, supra; Kirwan v. Murphy, 109 Fed. 354; Olson v. Thorndike, 76 Minn. 399; Menasha v. Lawson, supra; Wright v. Day, 33 Wis. 260; Sphung v. Moore, 120 Ind. 352; Palmer v. Dodd, 64 Mich. 474; Chan v. Brandt, 45 Minn. 93; St. Paul & S. & T. F. R. Co. v. First Div. St. Paul & Pac. R. Co., 26 Minn. 31; Ladd v. Osborne, 79 Iowa, 93; Heald v. Yumisko, 7 N. D. 422; Jones v. Pettibone, 2 Wis. 308.

*Wilson & Van Derlip* and *R. R. Briggs,* for respondents.

START, C. J.

These are ejectment actions to recover possession of certain land in section 4 of township 57, range 17, in the county of St. Louis, this state.

The controverted questions of law and fact are the same in each case, and for this reason they were by stipulation heard together in the district court and in this court. The defendants in each case recovered a judgment in their favor in the district court, from which the plaintiff appealed.

The here-material facts, as found by the trial court, are substantially these: The township named was ordered surveyed by the general land office, and the contract for the survey thereof awarded to H. S. Howe. He ran and marked the exterior lines of the township except the south line thereof, which had been previously surveyed, and set posts at all section and quarter-section corners on the three exterior lines, and a meander post upon the north line of the township where the line running west from the northeast corner of the township first strikes the shore of a lake known as "Ely Lake" or "Cedar Island Lake." He made no survey of the interior of the township, and no section lines therein were ever run by him, and no section or quarter-section corners were ever located or marked by him, with the possible exception of those in section 36, and none of the streams or permanent lakes, of which there were several in the township, were meandered by him. He, however, made, and filed with the United States surveyor general of the state of Minnesota, what purported to be field notes of a survey of the township, purporting to give the length and directions of all interior section lines therein, the location of all section and quarter-section posts and the bearing trees thereof, the character of the soil and timber, and all other data and information required, by the statutes of the United States and the rules of the general land office, to be ascertained and reported by deputy surveyors in due course of making surveys of public lands. With the exception of the description of the survey of the three exterior boundary lines of the township actually run by him, the field notes returned by him were imaginary and fictitious, and were, in fact, false and erroneous. From the purported field notes, it appeared that there existed in the northerly part of the township, lying in sections 2, 3, 4, 9, 10, and 11 thereof, a lake known as "Ely Lake," or "Cedar Island Lake," with a surface area, as indicated by the field notes, of about eighteen hundred acres. In fact, the lake then was and still is a body of water not exceeding eight hundred acres in area. It is a permanent, deep, and navigable lake, having high, steep, and heavily timbered banks, except about the outlet thereof. It does not, in fact, touch section 11 at all, and covers only an area of very small extent (less than one-half of

a forty-acre tract) in the southeast corner of section 4. Between the actual water line of the lake and the meander line thereof, as returned by the purported field notes, there were at the time of the survey, and still are, at least one thousand acres of high, tillable land, which has never been a part of the lake, and which was and is heavily timbered with trees of more than a century's growth, and growing down to the water's edge. The field notes and report of survey so made were duly approved, and a plat of the township made in accordance therewith, which was accepted and approved by the general land office as the official plat of the township. No other survey and plat of the township were ever made. The actual shore line of the lake as it was at the time the supposed survey was made and now is, and the meander line as marked on the official plat, and the location of the fractional lots with reference to such lines, their area and side lines, are correctly delineated on the following map:

Sections 2, 3, 4, 9, 10, 11. Town No. 57, Range 17.
St. Louis County, Minnesota.

The outer meander line on this map represents the one marked on the official plat as shown by the field notes of the surveyor, and the inner meander line represents the lake as it actually exists, and did exist when the field notes were made and filed. The land involved in these actions lies between those lines, and is and has been since 1892 in the possession and actual occupancy of the defendants, who have made permanent and valuable improvements thereon, and claim that it is subject to homestead entry.

Between December, 1879, and March, 1887, all of the lots here in question were patented and conveyed by the United States, pursuant to the laws relating to the disposal of public lands, and by patents containing the usual clause, "according to the official plat of the survey of the said lands returned to the general land office by the surveyor general." By divers mesne conveyances from the patentees, the title to lots 3, 5, 6, and 7, containing, according to the plat and to the patents therefor, the following quantities of land, respectively: Lot 3, 50.37 acres; lot 5, 34.75 acres; lot 6, 30.5 acres; and lot 7, 25.25 acres,—became vested in the plaintiff in the year 1891, and prior to the commencement of these actions; and the plaintiff is still the owner thereof, and, as such owner, has within the boundaries of the lots as shown upon the plat, and within the meander line of the lake described in the field notes, the full quantity of land above described as contained therein. The title to the government lots 1 and 8 (which are the only lots in the east half of section 4 apparently bounded by the lakes) was conveyed by government to certain patentees, and the patent title thereafter became vested in Simon J. Murphy and others, by whom a quitclaim deed was executed and delivered to the plaintiff, prior to the commencement of these actions, purporting to grant and quitclaim to the plaintiff that part of the southeast quarter of section 4 lying southerly and westerly of a line drawn from the center of the section to the southeast corner thereof, and also all the interest of the grantors in the west half of the section. At the same time, the plaintiff executed and delivered to Mr. Murphy and others a quitclaim deed purporting to convey to them that part of the east half of section 4 lying northerly and easterly of a

line drawn from the center of the section to the southeast corner thereof.

The trial court found, as a conclusion of law, that the plaintiff is the owner of government lots 3, 5, 6, and 7 in section 4 of township 57 north, of range 17 west, in St. Louis county, Minnesota; and that the pretended meander line of the lake, as the same is described in the purported field notes of the surveyor, and as delineated upon the plat, is the boundary line of the land owned by plaintiff in such lots. And, further, the defendants are not, nor is either of them, in possession of any part of the land in section 4 belonging to the plaintiff; nor do the defendants, or either of them, withhold from the plaintiff any land of which it is the owner, or to the possession of which it is entitled.

Do the facts found by the court sustain this conclusion? The claim of the plaintiff is that all patentees of lots which by the government plat were shown to abut upon the lake took their respective titles by reference to the plat, and thereby acquired, not only each as against the government, but each as against the other, the right to a frontage upon the lake; that in the direction of the lake each of these lots has only one boundary, the lake itself, and that the meander line is not a boundary line for any purpose. In support of this claim, counsel invokes the well-settled general rule that a meander line is not a boundary line, but that the water whose body is meandered is the true boundary, whether or not the meander line in fact coincides with the shore line, for the latter, being a natural monument, must control courses and distances.

The first and leading case in this court upon this question is that of Schurmeier v. St. Paul & Pac. R. Co., 10 Minn. 59 (82), which involved simply a question of riparian rights. In that case, the meander line was actually run along the Mississippi river, and was substantially the same as the shore line thereof. The land in dispute was a sand-bar island lying in the river, and the controversy was whether a fractional government lot, confessedly bounded by the river, stopped at the water's edge, or extended to the navigable waters of the stream, so as to include the island. The fact that plaintiff was a riparian owner was conceded, and only

the extent of his riparian privileges and estate was in controversy. The contention was made that the meander posts on the bank marked the boundary of the landowner, but the court held that the river, and not the meander line, was the boundary line of the lot, and that the patentee thereof took title to the land between the meander line and low-water mark in the river, which included the island in question. The case was affirmed by the supreme court of the United States. 7 Wall. 272.

In Everson v. City of Waseca, 44 Minn. 247, 46 N. W. 405, the meander line and the actual shore line of Loon lake in Waseca were not at all points coincident. Fractional government lot 2 was delineated as lying on the south side of, and as bounded by, the lake, but the meander line at this point was in fact run some distance from the shore of the lake, leaving a tract or point of several acres of dry land between it and the shore. It was held, following the Schurmeier case, that the patentee of lot 2 took title to such point. The case of Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, was one involving a question of riparian rights only for the meander line, and the actual shore lines of the lake meandered were substantially the same at the time the survey was made. The lake in question was a shallow and nonnavigable one, comprising about three hundred acres, and after the survey, and before the litigation arose, the waters of the lake gradually receded, and the lake had practically ceased to exist. Thereupon the land department of the United States caused a survey to be made of the former bed of the lake, and issued patents therefor. The plaintiffs claimed title thereto by virtue of their ownership of the land abutting on the lake when the original survey was made. The defendants claimed that the patent, according to the original survey through which plaintiffs claimed title to the former bed of the lake, only conveyed the land to the margin of the lake as it existed when the survey was made. Hence there was no question in that case as to any discrepancy between the meandered line and the actual shore line of the lake, but, as said by the court, the question was: What rights in or to the soil under water does the patentee of land bounded by a meandered inland lake acquire by his patent? The court held that such patentee took title to the

center of the lake and, therefore, the subsequent patent was void.

In Olson v. Thorndike, 76 Minn. 399, 79 N. W. 399, the meander line purported to coincide with the bank of the Minnesota river, but in fact it did not do so, and a point of land fifty-one rods long by twenty-six rods wide at one end, running to a point at the other end, lay between the meander line and the river. This court held, following the Schurmeier case, that the point of land lying outside of the meander line was a part of the fractional lot which abutted on the river according to the official plat. The court, however, in its opinion, said: "There may be cases in which the error in the government survey is so gross that the purchaser of the fractional or supposed fractional subdivision of government land will not take to the shore of the stream or lake, although the plat of the subdivision calls for such shore as one of the boundaries. It was held that Whitney v. Detroit, 78 Wis. 240, 47 N. W. 425, presented such a case. That case is cited in Lamprey v. Mead, 54 Minn. 290, 55 N. W. 1132. But there is nothing in the record from which it can be held that this is such a case."

In the cases of Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838, and Mitchell v. Smale, 140 U. S. 406, 11 Sup. Ct. 819, 840, the general rule announced in the Schurmeier case was followed. But in those cases, as well as in the cases in this court to which we have referred, there was in fact a stream or lake to be meandered, and the shore line of the body of water and the meander line substantially coincided except where tongues or points of land extended out into the body of water beyond the meander line, or the waters had receded; and the question was one of riparian rights strictly.

No such questions are involved in this case, for the question here is as to the boundaries of the fractional lots owned by the plaintiffs. If in this case there was in fact, or ever had been, a lake upon which any part of the several fractional lots abutted, the general rule would apply, and their boundary would be the lake. But such is not this case, for there was in fact no lake at or within any reasonable distance of the meandered line or any part thereof, and never had been, to which the meander line might be found referable. It also appears, from the court's findings of

fact and Exhibit B, that the side lines of some of the lots would have to be extended from one-half to one mile to reach the lake; that, as to others, if their side lines were extended at right angles they would miss the lake entirely; and that, if the side lines of all of the fractional lots were so extended, they would overlap each other in inextricable confusion. And further, that, if the so-called meander line be accepted as a boundary line, it will give to the patentees or their grantees the full quantity of land bought and paid for by them, but, if they are permitted to extend their lot lines through the adjacent forest to the lake, they will obtain more than three times as much land as they purchased and paid for. In short, this is not a case where the surveyor, in running a meander line, has made a fair and honest attempt to follow the sinuosities of the shore line of an actual body of water, and by exclusion or inclusions of irregularities of contour has produced an average and approximately correct result, but one where the existence, at any time, of a lake upon which any part of the fractional lots in question could abut, is a pure fiction. Such being the case, it is not within the general rule as to meander lines; for the far-away lake is an impossible boundary for all of the lots in question, and could never have been intended by the government and the patentees as the boundary of the lots. The official plat was only intended to be a picture of the actual conditions on the ground; but the fraudulent mistake in the plat in this case was so gross that no man actually viewing the premises could possibly be misled, or believe that the shore line of the lake was intended as the boundary line of the lots. He would understand at once that the meander line as traced on the plat was the actual boundary line of the lots.

This case, then, is one where the call for the natural monument, the lake, must be disregarded; for the admitted facts show that it is an impossible call, and that, if it is rejected, the courses and distances and the meander line will exactly close, and give to the plaintiff the precise quantity of land bought from the government and paid for. It falls within the rule that a meander line is not, as a general proposition, a boundary line; yet the boundaries of fractional lots will not be indefinitely extended where they appear

by the government plat to abut on a body of water which in fact has never existed at substantially the place indicated on the plat. In such exceptional cases, the supposed meander line will, if consistent with the other calls and distances indicated on the plat, mark the limits of the survey, and be held to be the boundary line of the land it delimits. Horne v. Smith, 159 U. S. 40, 15 Sup. Ct. 988; Niles v. Cedar Point Club, 175 U. S. 300, 20 Sup. Ct. 124; Fuller v. Shedd, 161 Ill. 462, 44 N. E. 286; Whitney v. Detroit, 78 Wis. 240, 47 N. W. 425; Grant v. Hemphill, 92 Iowa, 218, 59 N. W. 263, 60 N. W. 618; French v. Springer, 35 Ore. 312, 58 Pac. 102.

The last case cited was affirmed by the supreme court of the United States, and its decision in that case seems conclusively to establish the rule we have stated. In that case the government plat showed that the fractional lots in question were bounded on the north by the meander line of Malheur lake. The land in controversy lay outside the meander line, but adjoined the lots. The plaintiff claimed that the lake, at the time of the survey and for some years thereafter, was a continuous body of water up to the meander line, but that from year to year, for some time, its waters receded, leaving the disputed land bare. The defendant introduced evidence tending to show that there never was a lake in front of the lots; that Malheur lake was a well-defined body of water lying northeasterly from the lots; that, if the lines of the lots were extended north indefinitely, they would never intersect the lake; that the lake never extended to the supposed meander line; and that there had never been any recession of the waters, so as to constitute the land in controversy reliction in front of the lots. The questions of fact so presented were tried, and found in favor of the defendant, and, upon plaintiff's appeal, the supreme court of Oregon, in affirming the decision of the trial court, said:

"The real question of cardinal and pivotal concern arises upon the urgent and strong contention and argument of counsel for plaintiff that the official survey of the lake, the approval thereof, and the official plats and maps made thereunder, showing the lake and the meander line thereof, conclusively establish the fact and location of the lake so far as the rights of riparian grantees are concerned, and the government and its grantees are estopped to

deny the supposed fact as represented to the purchasers of abutting land. * * * If there never was a lake in front of plaintiff's lots, or if one did exist there at the time of the survey, then there was no natural object or monument marking the north boundary of said lots; hence resort must be had to the secondary evidence, viz., the courses and distances which are ascertainable from the plats and surveys, and they must prevail. The result is natural, and the land conveyed would be just what a mathematical calculation would produce from the field notes of the survey of the fractional sections and the supposed meander line. * * *"

The cause was brought into the supreme court of the United States by writ of error sued out by the plaintiff, and he there cited, in his brief, Murphy v. Kirwan (C. C.) 103 Fed. 104, and urged, among others, this point: "The patents in this instance, on their face and when read in connection with the plats, conveyed all public land up to the line of Lake Malheur. If, by reason of any error or fraud, the survey improperly included or omitted any public land, then the obviously proper mode of correction was a bill in equity putting directly in issue the supposed error or fraud. To allow the apparent purpose and legal effect of the patents to be defeated upon proof of error in the plats does not differ, in principle or practical result, from cancelling the patents in a suit at law." The court, however, affirmed the decision of the state court, and in doing so said:

"If, indeed, there had been a lake in front of these lots at the time of the survey, which lake had subsequently receded from the platted meander line, the claim of the owner of the lots to the increment thus occasioned might be conceded to be good if such were the law of the state in which the lands were situated. But if there never was such a lake—no water forming an actual and visible boundary—on the north end of the lots, it would seem unreasonable either to prolong the side lines of the survey indefinitely until a lake should be found, or to change the situs of the lots laterally in order to adapt it to a neighboring lake. The jury having found that the facts under this issue were as claimed by the defendant in error, the conclusion must be that the rights of the plaintiff in error must be regarded as existing within the

actual lines and distances laid down in the survey and to the extent of the acreage called for in the patents, and that the meander line was intended to be the boundary line of the fractional section." French-Glenn v. Springer, 185 U. S. 47.

Our conclusion is that the trial court in this case was correct in holding that the boundary line of the plaintiff's lots was the line appearing on the government plat as a meander line.

Judgment affirmed.